IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Retha Warren, | ) | C/A No.: 1:14-1985-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On April 15, 2010, Plaintiff filed an application for SSI in which she alleged her disability began on January 1, 2007. Tr. at 95, 125–32. Her application was denied initially and upon reconsideration. Tr. at 101–06, 110–11. On May 8, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Frederick W. Christian. Tr. at 53–93

(Hr'g Tr.). The ALJ issued an unfavorable decision on June 7, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 16–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 7–11. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 19, 2014. [ECF No. 1].

B.    Plaintiff's Background, Medical History, and Lay Witness Statements

1.    Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 59. She completed the eleventh grade and obtained a high school diploma after attending night school. Tr. at 59, 271. Her past relevant work ("PRW") was as a cashier, a nursing assistant, and a housekeeper. Tr. at 86–87. She alleges she has been unable to work since April 15, 2010.[1] Tr. at 203.

2.    Medical History

Plaintiff presented to Gourdon W. Counts, M.D. ("Dr. Counts") on March 6, 2009. Tr. at 217. She indicated she was doing well and that she needed a physical examination for a new job application. *Id.* Dr. Counts noted that Plaintiff had "been denied Medicaid and needs to go to work." *Id.*

---

[1] In a pre-hearing brief, Plaintiff's attorney amended Plaintiff's alleged onset date from January 1, 2007, to April 15, 2010, the date she filed her application for benefits.

On March 12, 2009, Plaintiff presented to Dr. Counts to discuss recent bloodwork. Tr. at 216. Dr. Counts increased Plaintiff's dosage of Lantus insulin to 30 units at bedtime and instructed Plaintiff to check her fasting blood sugar twice daily. *Id.*

On May 14, 2009, Plaintiff presented to Free Medical Clinic for a refill of her blood pressure medications. Tr. at 393. She complained of chest pain that radiated to the left side of her neck and into her left arm. *Id.* Plaintiff was referred to Palmetto Health Richland for observation. Tr. at 366. An EKG, an enzyme test, and a stress test were all negative for acute coronary syndrome. *Id.* Plaintiff was instructed to follow up with her primary care physician for diabetes and hypertension. *Id.*

Plaintiff presented to Sylva Al-Soudi, M.D. ("Dr. Al-Soudi"), on June 30, 2009, to establish treatment as a new patient. Tr. at 269. She reported being out of her medications for a week. *Id.* Dr. Al-Soudi indicated Plaintiff was 5'2" and weighed 193 pounds. *Id.* She observed no abnormalities on physical examination. Tr. at 270. She prescribed Lisinopril for hypertension and instructed Plaintiff to maintain a blood sugar log and return in two weeks. *Id.*

On July 24, 2009, Plaintiff presented to Stephen Hines, M.D. ("Dr. Hines"), for a diabetes check-up. Tr. at 265. Dr. Hines noted that Plaintiff had been "quite noncompliant in past" and that "if she doesn't have money she doesn't keep med appts and she stops her meds for days[ ]or weeks at a time." *Id.* Plaintiff's blood glucose was significantly elevated at 347. Tr. at 266. Dr. Hines observed Plaintiff to have tenderness in the left lower quadrant of her abdomen. *Id.* He indicated Plaintiff was "unaware of consequences" and "demonstrates no understanding of present illness." *Id.*

Plaintiff followed up with Dr. Hines on August 31, 2009, with complaints of erratic blood sugar and numbness, tingling, and burning sensations in her bilateral feet. Tr. at 260. Dr. Hines noted that Plaintiff's Lantus dosage was changed to 50 units nightly and that she had reported improvement. *Id.* He prescribed medications, ordered lab work, counseled Plaintiff on diet and exercise, and instructed her to follow up in one month. Tr. at 266–67.

Plaintiff presented to Julie Kahler, M.D. ("Dr. Kahler"), on November 17, 2009. Tr. at 258. She complained of a cough and bilateral hip and knee discomfort. *Id.* Dr. Kahler indicated Plaintiff's body mass index ("BMI") was greater than 34 and that she had "smoked for many years." *Id.* She advised Plaintiff to quit smoking and changed her blood pressure medication from Lisinopril to Hydrochlorothiazide. Tr. at 259.

On March 11, 2010, Plaintiff presented to Michael Faircloth, D.O. ("Dr. Faircloth") to follow up regarding diabetes and hypertension. Tr. at 253. Dr. Faircloth observed no abnormalities on examination. *Id.* He noted that Plaintiff's diabetes was unchanged and that she could not afford Lantus. *Id.* He filled out paperwork for Plaintiff to receive prescription assistance and replaced her prescription for Hydrochlorothiazide with an ace inhibitor. Tr. at 253–54.

Plaintiff presented to Lexington Medical Center on March 17, 2010, with a nosebleed and nausea. Tr. at 230. She reported that she was not taking her insulin on a regular basis. *Id.*

Plaintiff followed up with Dr. Faircloth on March 19, 2010. Tr. at 251. Dr. Faircloth noted that Plaintiff was still out of Lantus, but paperwork had been completed

for prescription assistance. *Id.* He provided Plaintiff samples of Lantus and instructed her to follow up at her next scheduled visit or if her symptoms worsened. Tr. at 251–52.

On June 11, 2010, Plaintiff presented to Dr. Faircloth for follow up regarding diabetes and hypertension. Tr. at 248. Plaintiff complained of "bad nerves." *Id.* Dr. Faircloth observed Plaintiff to be overweight, but indicated no other abnormalities. Tr. at 248–49. Plaintiff's gait and foot examination were normal. Tr. at 249. Dr. Faircloth changed Plaintiff's prescription for Glucotrol to a 24-hour type and prescribed an extended-release type of Metformin for diabetes. *Id.* He also prescribed Ranitidine HCL 300 milligrams and Omeprazole Magnesium 20 milligrams for gastroesophageal reflux disease ("GERD"). *Id.*

Plaintiff attended a mental status examination with A. Nicholas DePace, Ph. D. ("Dr. DePace"), on August 3, 2010. Tr. at 271–74. Plaintiff reported that her physical problems prevented her from working. Tr. at 271. She described multiple stressors that included an intellectually disabled daughter with behavioral problems and a young granddaughter that required her care. Tr. at 271–72. Plaintiff drove herself to the evaluation and reported no difficulty finding the office. Tr. at 272. She was appropriately dressed and groomed, alert and oriented in all spheres, and had normal psychomotor behavior and speech. *Id.* She denied sleep problems and reported a good appetite. *Id.* She maintained eye contact, was cooperative, and followed directions. *Id.* Dr. DePace diagnosed Plaintiff as having adjustment disorder with chronic anxiety and parent-child relational problems. Tr. at 273.

Plaintiff followed up with Dr. Faircloth on August 20, 2010, and reported a backache, frequent urination, a strong urine smell, and incomplete emptying of her bladder. Tr. at 442. Dr. Faircloth noted no abnormalities on examination. Tr. at 443. He increased Plaintiff's Lantus dosage for diabetes and prescribed Flexeril for backache. *Id.*

On or about September 1, 2010, Plaintiff attended a consultative examination with C. P. Dunbar, M.D. ("Dr. Dunbar"). Tr. at 279–81. Plaintiff complained of low back pain with occasional numbness and radiation down her right leg. Tr. at 279. She reported diabetes, visual impairment, neuropathy, hypertension, shortness of breath, acid reflux, and arthritis in her hands, shoulders, and hips. *Id.* Dr. Dunbar observed Plaintiff to have some mild abdominal tenderness. Tr. at 280. He indicated Plaintiff was able to walk without assistance and get on and off the exam table. *Id.* A straight-leg raise test was positive bilaterally at 70 degrees. *Id.* Plaintiff was able to bend at the hips to 80 degrees. *Id.* Gross motor and sensory exams were intact. *Id.* Dr. Dunbar indicated Plaintiff's reported pain level was inconsistent with her examination and that she did not appear to be in that much pain. *Id.* Plaintiff demonstrated no problems with memory, affect, or judgment and had no marked neurological limitations. Tr. at 281. Dr. Dunbar's impressions were as follows: memory loss; "[h]istory of low back pain with this exam inconsistent with reported pain levels"; diabetes; neuropathy, possibly secondary to her diabetes; hypertension; chronic obstructive pulmonary disease ("COPD"); arthritis; mid-epigastric pain, most likely secondary to gastritis; vision impairment, mild; and Morphine, Keflex, steroids, and sulfa allergies. *Id.*

6

Plaintiff followed up with Dr. Faircloth on September 13, 2010. Tr. at 440. She indicated her acid reflux had not improved. *Id.* Dr. Faircloth ordered testing for H. pylori infection and instructed Plaintiff to follow up in three months. *Id.*

State agency consultant Judy K. Martin, M.D., completed a psychiatric review technique form ("PRTF") on September 6, 2010. Tr. at 282–93. She considered Listing 12.06 for anxiety-related disorders, but concluded that Plaintiff's impairment was not severe. Tr. at 282. She found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 290.

Plaintiff followed up with Locke Simons, M.D. ("Dr. Simons"), on December 13, 2010. Tr. at 437. She reported reflux symptoms, throbbing in her bilateral legs during the night, and pain in the joints of her hands. *Id.* Dr. Simons observed Plaintiff to have a mild expiratory wheeze with forced expiration and diminished dorsalis pedis pulses bilaterally. Tr. at 438. He changed Plaintiff's diabetes medication from Levemir to Humalog because of cost, increased her dosages of Lisinopril and Omeprazole, and prescribed Mobic for inflammation. *Id.*

On January 22, 2011, Plaintiff saw J. P. Ginsberg, Ph. D., for a mental status examination. Tr. at 298–300. Dr. Ginsberg described Plaintiff as being in mild distress. Tr. at 298. Plaintiff was appropriately dressed and had good hygiene. *Id.* Dr. Ginsberg indicated her psychomotor speed and speech were normal and her eye contact was good. *Id.* He stated Plaintiff's thoughts were unremarkable and were not slowed. Tr. at 299. He indicated Plaintiff's affect was constricted or flat. *Id.* Plaintiff stated she sometimes heard

a voice calling her name, but Dr. Ginsberg indicated reality testing for this was questionable. *Id.* Plaintiff demonstrated signs of paranoia and endorsed sad mood, loss of interest, and feelings of worthlessness. *Id.* She scored 32 of 38 points on the Kokmen Short Test of Mental Status, which was considered normal. *Id.* She could tell time, but did not accurately make change. *Id.* Dr. Ginsberg estimated Plaintiff's IQ to be below average or average. *Id.* He diagnosed post-traumatic stress disorder and major depression with psychosis. *Id.* He indicated the following:

> Functional impairments due to her disorder cause severe limitations in ADLs and social interactions and moderate limitations in interests. Overall cognitive function appears to be fair. In an ordinary workplace setting, she may be able to follow rules and comprehend and follow simple instructions, but is expected to have difficulty dealing with stress and maintaining both speed and endurance in work-related tasks. In the examiner's opinion, the applicant is marginally competent to handle funds in her own best interest.

Tr. at 300.

Plaintiff presented to Ashley Wiggins, M.D. ("Dr. Wiggins"), on February 7, 2011, with complaints of numbness and tingling in her left arm and hand that were worse at night. Tr. at 436, 455. She stated that the pain began a couple of weeks before and that her hands would cramp and draw up when she washed dishes. *Id.* She also indicated Lisinopril caused her to develop a cough. *Id.* Dr. Wiggins observed a positive Phalen's maneuver and Tinel's sign in Plaintiff's bilateral wrists.[2] Tr. at 454. She assessed

---

[2] Phalen's maneuver and Tinel's sign are two tests used by physicians to produce the symptoms of carpal tunnel syndrome. National Institute of Neurological Disorders and Stroke, *Carpal Tunnel Syndrome Fact Sheet*, NIH Publication No. 12-4898 (July 2012). Available from: http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm. "In the Tinel test, the doctor taps on or presses on the median nerve in the patient's wrist." *Id.* The test is considered to be positive if the patient reports tingling in

"arthritis vs. carpal tunnel vs. diabetic neuropathy" and stated "[m]ay be a combination as well." She prescribed Mobic, bilateral wrist splints, and Neurontin and ordered that Plaintiff's TSH, B12, rheumatoid factor, and ANA be checked. *Id.*

On February 23, 2011, Plaintiff presented to the emergency department at Lexington Medical Center with complaints of pain in her chest, arms, and legs. Tr. at 355. She also reported minimal swelling in her bilateral hands and feet and mild shortness of breath. *Id.* Objective tests showed no significant abnormalities. Tr. at 356.

State agency consultant Edward Waller, Ph. D. ("Dr. Waller"), completed a PRTF on March 1, 2011, and considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 302–15. He found that Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 312. Dr. Waller also completed a mental residual functional capacity ("RFC") assessment and concluded that Plaintiff was moderately limited with regard to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek

---

the fingers or a shock-like sensation. *Id.* The Phalen test "involves having the patient hold his or her forearms upright by pointing the fingers down and pressing the backs of the hands together." *Id.* Carpal tunnel syndrome is indicated if the patient reports tingling or numbness in the fingers within a minute. *Id.* "Often it is necessary to confirm the diagnosis by use of electrodiagnostic tests." *Id.* A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 316–18. Dr. Waller specified the following:

> In consideration of medical functional findings cited on the PRTF of 03-01-11, Retha Warren has the following abilities. She is able to understand short and simple instructions and is capable of performing simple tasks without special supervision. She is capable of maintaining a regular work schedule, but may miss an occasional workday due to major depression and PTSD. She would perform better in a job setting that does not require ongoing interaction with the public. She can make simple work related decisions, request assistance from others, and use available transportation. She can adhere to basic standards of hygiene and safety.

Tr. at 318.

Plaintiff presented to Tonya Lewis, MS, PA-C ("Ms. Lewis"), on April 12, 2011, with complaints of nausea, acid reflux, pain in her legs and hands, headaches, and "bad nerves" as a result of being worried about her daughter. Tr. at 434. Plaintiff requested an antidepressant because she was having difficulty dealing with her daughter's hospitalization. *Id.* She reported insomnia as a result of thoughts repeating in her head. *Id.* Ms. Lewis observed Plaintiff to be moderately distressed, restless, and to cry during the exam. Tr. at 435. She diagnosed other psychological or physical stress and prescribed Ativan and Celexa. *Id.*

On April 26, 2011, Plaintiff reported to Ms. Lewis that the burning sensation in her stomach had worsened and that Celexa was making her nauseated and achy. Tr. at

432. Ms. Lewis observed no abnormalities during the examination and noted that Plaintiff had appropriate judgment, was oriented, had normal memory, and had appropriate mood and affect. Tr. at 433. She discontinued Celexa, but continued Plaintiff's prescription for Ativan. *Id.*

Plaintiff followed up with Ms. Lewis on May 10, 2011, and reported that she was doing well on Ativan. Tr. at 430. She complained of a burning sensation in her stomach, joint pain in her hands and feet, and numbness in her hands. *Id.* Ms. Lewis observed no abnormalities on examination. Tr. at 431. She assessed GERD and other psychological or physical stress, but noted that Plaintiff's problem had improved. *Id.*

On May 23, 2011, Plaintiff presented to Ms. Lewis with a complaint of constant abdominal pain in her epigastrium that radiated to her lower abdominal quadrants and worsened after eating. Tr. at 428. Ms. Lewis observed tenderness in Plaintiff's epigastric area, but no other abnormalities. Tr. at 429. She prescribed Lyrica for carpal tunnel syndrome and Carafate and Promethazine for GERD. *Id.*

Plaintiff returned to Ms. Lewis on June 2, 2011, and reported that her stomach was still "burning like fire" and that her medications were not helping. Tr. at 426. Ms. Lewis observed Plaintiff to appear moderately distressed and to have tenderness in her epigastric area. Tr. at 427. She diagnosed gastritis and indicated she would call Plaintiff with the results of her H. pylori test. *Id.*

On June 16, 2011, Plaintiff informed Ms. Lewis than Metronidazole and Doxycycline were making her sick and that she was experiencing tingling in her fingers and arms. Tr. at 424. Ms. Lewis indicated Plaintiff was mildly distressed and had

tenderness in her epigastric area. Tr. at 425. She prescribed Promethazine for nausea and instructed Plaintiff to finish her antibiotics. *Id.*

Plaintiff presented to Ms. Lewis on June 20, 2011, with tingling and numbness in her bilateral arms and hands and a tingling and stabbing sensation in her bilateral feet. Tr. at 422. She complained that Metronidazole and Doxycycline made her feel bad. *Id.* Ms. Lewis noted that Plaintiff was nervous, but described no other abnormalities on examination. Tr. at 423. She explained that she had prescribed Metronidazole and Doxycycline because they were more affordable, but that she would change Plaintiff's antibiotics in light of her side effects. *Id.* She stressed the importance of Plaintiff following a diabetic diet and prescribed Gabapentin for peripheral autonomic neuropathy. *Id.*

On July 15, 2011, Plaintiff presented to the emergency department at Lexington Medical Center complaining of pain in her chest and back and shortness of breath. Tr. at 340. A CT angiogram of Plaintiff's chest was unremarkable and a portable chest x-ray was negative. Tr. at 349, 351.

Plaintiff followed up with Ms. Lewis for diabetes and hypertension on August 22, 2011. Tr. at 419. She indicated Gabapentin was not working. *Id.* Ms. Lewis encouraged Plaintiff to follow a diabetic diet. *Id.* Ms. Lewis observed tenderness in Plaintiff's epigastric area, but indicated no additional abnormalities on examination. Tr. at 420. She prescribed Lyrica for neuropathy. Tr. at 421.

Plaintiff presented to Lexington Medical Center on September 29, 2011, complaining of nosebleed, sinus pressure, and chest pressure. Tr. at 329. Plaintiff's

nosebleed and chest pain subsequently resolved. *Id.* Stress tests indicated no signs of myocardial infarction or ischemia. Tr. at 331–32. Plaintiff was discharged home with a prescription for an antibiotic and instructed to follow up with her doctors. Tr. at 330. The next day, Plaintiff presented to Lexington Medical Center Urgent Care with another nosebleed. Tr. at 398. Michael Taillon, M.D., referred Plaintiff to an ear, nose, and throat specialist. *Id.*

On October 1, 2011, Plaintiff presented to Palmetto Health Richland for a nosebleed. Tr. at 403. She was again referred to an ear, nose, and throat specialist. Tr. at 404.

Plaintiff presented to Ms. Lewis on October 6, 2011, complaining of a lesion on the lateral aspect of her right lower leg. Tr. at 414. Ms. Lewis drained the abscess and applied dressing. Tr. at 415.

Plaintiff presented to CENTA Medical Group, P.A., for recurrent nosebleeds on October 5, 2011. Tr. at 325. She underwent a full sinus CT on October 11. Tr. at 324. Jonathan D. King, M.D., F.A.C.S., noted a severe S-shaped nasal deformity and a focal right maxillary sinus polyp. *Id.*

Plaintiff presented to Ms. Lewis on March 1, 2012, with complaints of diarrhea, poor appetite, and lower quadrant pain. Tr. at 407. Ms. Lewis observed Plaintiff to have an obese abdomen and mild tenderness in her epigastric area, but noted no other abnormalities on examination. Tr. at 409. She continued Plaintiff's insulin dosage and instructed her to start a diabetic diet. Tr. at 410. Ms. Lewis completed a questionnaire regarding Plaintiff's impairments and symptoms. Tr. at 320–22. She indicated she saw

Plaintiff every three months for diabetes and anxiety. Tr. at 320. She indicated Plaintiff moved to attempt a more comfortable position and was unable to sit or stand while waiting to be seen. *Id.* She identified Plaintiff's symptoms as pain, nausea, vomiting, dizziness (if blood sugar was low), and leg cramps. *Id.* She indicated Plaintiff experienced chronic pain in her lumbar spine, chronic gastritis, anxiety, and neuropathic leg and foot pain. *Id.* She described Plaintiff's experience of pain as often severe enough to interfere with attention and concentration. Tr. at 321. She indicated Plaintiff could walk one to two city blocks without rest or severe pain. *Id.* She indicated Plaintiff could sit for less than 15 minutes at a time and stand for less than 15 minutes at a time. *Id.* Ms. Lewis indicated Plaintiff could sit for about two hours in an eight-hour workday. *Id.* She assessed Plaintiff as being able to lift 10 pounds occasionally and less than 10 pounds frequently. Tr. at 322. She indicated Plaintiff could rarely crouch or climb stairs or ladders. *Id.* She reported Plaintiff could occasionally twist and stoop (bend). *Id.* She indicated Plaintiff had no significant limitations her abilities to repetitively reach, handle, or finger. *Id.* She indicated Plaintiff's impairments were likely to produce good and bad days and indicated Plaintiff would likely be absent from work about four days per month as a result of her impairments or treatment. *Id.*

Plaintiff followed up with Ms. Lewis on April 17, 2012 for left elbow pain. Tr. at 445. She indicated that the pain was nagging and aching and that it typically bothered her at night. *Id.* Ms. Lewis performed a comprehensive physical examination and noted no abnormalities. Tr. at 446–47. Plaintiff's non-fasting glucose was high at 372 and her hemoglobin A1C was also high at 11.7. Tr. at 449–50.

14

### 3.    Lay Witness Statements

Plaintiff's daughter, Jane Corder ("Ms. Corder"), provided a written statement to the Social Security Administration ("SSA") on April 13, 2012. She indicated she saw Plaintiff daily and assisted her with household chores. Tr. at 198–99. Ms. Corder indicated Plaintiff could sweep for 10 minutes at a time, but had to rest for 20 minutes thereafter because of numbness in her arms and hands and pain in her back. Tr. at 198. She indicated Plaintiff experienced symptoms of depression two to three days per week. *Id.* Ms. Corder wrote that Plaintiff had problems with nosebleeds, poor vision, lightheadedness, and diabetes and that she experienced pain and stinging in her feet. Tr. at 198–99.

On April 17, 2012, Betty Harmon ("Ms. Harmon") indicated in a statement that she and Plaintiff had been friends for 40 years, spoke daily, and saw each other every other day. Tr. at 201. Ms. Harmon indicated Plaintiff had pain in her arms, hands, and back. *Id.* She indicated Plaintiff was frequently depressed and cried often. *Id.* She stated Plaintiff had problems with coughing and shortness of breath. *Id.* Ms. Harmon indicated Plaintiff could only sweep for 10 to 15 minutes at a time. *Id.* She stated she sometimes helped Plaintiff to complete household chores. *Id.*

### C.    The Administrative Proceedings

#### 1.    The Administrative Hearing

##### a.    Plaintiff's Testimony

At the hearing on May 8, 2012, Plaintiff testified she was 5' 3" tall, weighed 180 pounds, and was right-handed. Tr. at 59. She stated she had a valid driver's license and

drove a car "sometimes." Tr. at 59–60. Plaintiff testified she was divorced and lived in a home with her ex-husband, her 25-year-old daughter, and her five-and-a-half year old granddaughter. Tr. at 60. Plaintiff indicated she last worked for a brief period in 2007, but left her job as a cashier because of swelling in her feet and problems with her hands. Tr. at 61.

Plaintiff testified that she had diabetes and took 30 units of insulin in the morning and 30 units in the evening. Tr. at 62–63. She indicated she checked her blood sugar regularly and that it typically ranged from 230 to 285. Tr. at 63. Plaintiff stated she experienced pain in her arms and hands that was "worse than a toothache" and that she felt nauseated. Tr. at 63–64. She indicated her pain increased with activities like picking up things and writing. Tr. at 64. Plaintiff stated she developed burning and tingling sensation in her legs and feet when she sat or stood for too long. Tr. at 64–65. Plaintiff testified she experienced pain in her middle and lower back when stooping. Tr. at 65. She stated she had some problems with reflux and gastritis that affected her ability to eat. Tr. at 65–66. She indicated she had lost 30 pounds over a four-and-a-half month period. Tr. at 66. Plaintiff stated her blood pressure was well-controlled on medication and her nosebleeds had resolved. Tr. at 67.

Plaintiff testified she experienced depression and crying spells approximately three times per week. Tr. at 73. She stated she sometimes started tasks and failed to complete them. Tr. at 74. She indicated she did not enjoy being in crowds because she believed others were talking about her. Tr. at 74–75. She stated she sometimes heard voices and saw things that were not actually present. Tr. at 75. Plaintiff indicated she took

Ativan for anxiety, but was prescribed no medication for depression. Tr. at 80. She stated she received treatment from a mental health clinic in the past, but denied receiving mental health treatment since 2003. Tr. at 81–82.

Plaintiff testified she could lift about 10 pounds, sit for an hour at a time, and stand for 10 to 15 minutes at a time. Tr. at 71–72, 80. She stated she had difficulty climbing stairs because her legs gave way, but denied using an assistive device. Tr. at 76, 80. She testified that her medications made her sleepy and that she took naps that lasted approximately an hour-and-a-half on three days per week. Tr. at 75. She indicated she wore braces on her hands while sleeping. Tr. at 85.

Plaintiff testified she typically performed household chores, but that her daughter and another woman helped her when she felt really bad. Tr. at 67–68. Plaintiff indicated she swept, mopped, and straightened up for 10 to 15 minutes at a time. Tr. at 68. She stated she rested for 20 to 30 minutes before she could perform additional housework. Tr. at 69. She estimated that she was unable to perform chores on three days per week because of worsened symptoms. *Id.* Plaintiff indicated she shopped for groceries and prepared meals. Tr. at 70. She stated she sometimes had difficulty reaching for items while shopping. Tr. at 71. She indicated she could care for her personal needs. Tr. at 72. Plaintiff stated she attended church three times per week. *Id.* She testified that she cared for her granddaughter during the day. Tr. at 77. She indicated her daughter was disabled because of her mental health and kidney functioning. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Jr., reviewed the record and testified at the hearing. Tr. at 85–92. The VE categorized Plaintiff's PRW as a cashier, *Dictionary of Occupational Titles* ("*DOT*") number 211.462-014, as light with a specific vocational preparation ("SVP") of three; a nursing assistant, *DOT* number 355.674-014, as medium with an SVP of four; and a housekeeper, *DOT* number 323.687-014, as light with an SVP of two. Tr. at 86–87. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform unskilled work with the following restrictions: no contact with the public in performance of the job duties; work at the lowest end of the stress scale; no jobs paid on a piece-rate basis; no work as part of a team; and no high production quotas. Tr. at 87. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 88. The ALJ asked whether there were any other jobs in the regional or national economies that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of two as a laundry worker, *DOT* number 369.687-026, with 7,000 positions in the local economy and 280,000 positions nationally; a dishwasher, *DOT* number 318.687-010, with 4,000 positions in the local economy and in excess of 155,000 positions nationally; and an industrial janitor, *DOT* number 323.687-010, with 3,000 positions in the local economy and in excess of 122,000 positions nationally. Tr. at 88–89.

The ALJ next asked the VE to assume the same limitations set forth in the first hypothetical, but to further assume the individual was restricted to lifting, carrying, and handling no more than 10 pounds frequently and no more than 20 pounds occasionally.

Tr. at 89. The ALJ asked if there were jobs that the individual could perform with those restrictions. *Id.* The VE identified light jobs with an SVP of two as a machine tender, *DOT* number 920.685-086, with 20,000 positions in the local economy and in excess of 800,000 positions nationally; an inspector, *DOT* number 222.687-042, with 9,000 positions in the local economy and in excess of 345,000 positions nationally; and a garment folder, *DOT* number 789.687-066, with 1,000 positions in the local economy and in excess of 39,000 positions nationally. Tr. at 89–90.

The ALJ asked the VE to assume that the individual could not complete any task on a sustained basis for a two-hour period, eight-hour workday, or 40-hour workweek. Tr. at 90. The ALJ asked the VE what effect these limitations would have on the jobs identified in response to the prior hypothetical questions. *Id.* The VE testified that such an individual would be unable to maintain gainful employment at any skill or exertional level. Tr. at 90–91.

Plaintiff's attorney asked the VE to assume a hypothetical individual of Plaintiff's vocational profile and to assume that individual would miss four days of work per month because of her impairments or treatment. Tr. at 92. He asked if such an individual could maintain any employment. *Id.* The VE testified that such an individual would be unable to keep a job because the level of absenteeism described in the hypothetical question was not consistent with gainful employment. *Id.*

### 2.    The ALJ's Findings

In his decision dated June 7, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since April 15, 2010, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: anxiety; post-traumatic stress disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is restricted to the performance of unskilled work however that narrow range of unskilled work does not involve contact with the public in performance of the job duties, and that the narrow range of unskilled work is considered at the lowest level of the stress scale in the world of work, specifically excluding jobs where the worker is paid on a piece-rate basis, where the worker works as part of a team, or where the worker has high production quotas recognizing that every job has some production requirements.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born November 15, 1959 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since April 15, 2010, the date the application was filed (20 CFR 416.920(g)).

Tr. at 21–30.

### D.    Appeals Council Review

On August 23, 2013, the Appeals Council issued a notice denying Plaintiff's request for review. Tr. at 7–12. It indicated it reviewed the medical records from Calhoun Falls Family Practice dated February 7, 2011, but determined the records did not provide a basis for changing the ALJ's decision. Tr. at 8.

## II.    Discussion

Plaintiff alleges in the complaint that the decisions of the ALJ and Appeals Council were not supported by substantial evidence and contained errors of law. [ECF No. 1 at 3]. Plaintiff neglected to submit a brief that detailed specific errors of law.[3]

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

---

[3] Plaintiff's brief was initially due on November 3, 2014. [ECF No. 8]. Plaintiff filed a motion requesting a 60-day extension on November 3, citing counsel's caseload and his wife's/legal assistant's health problems. [ECF No. 10]. The undersigned granted Plaintiff's motion, making her brief due on January 5, 2015. [ECF Nos. 10, 11]. On January 6, the undersigned issued an order directing Plaintiff to advise the court whether she wished to proceed and to file a brief by January 13. [ECF No. 13]. Plaintiff filed a second request for extension on January 14, citing the recent termination of counsel's legal assistant and an inability to locate the exhibit CD. [ECF No. 15]. The undersigned granted Plaintiff's second extension request and reminded Plaintiff that a copy of the transcript was available on the docket. [ECF No. 16]. Plaintiff's brief was due by January 29, 2015. *Id.* Plaintiff again failed to timely file a brief and requested no further extension. On January 30, 2015, the undersigned issued an order directing the Commissioner to file a brief supporting her decision. [ECF No. 18]. The Commissioner filed a brief on March 11, 2015, and Plaintiff filed no reply. [ECF No. 20].

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

_____

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v.

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

In the absence of an argument from Plaintiff detailing specific errors of law, the undersigned considers only whether the decisions of the ALJ and Appeals Council were supported by substantial evidence. To this end, the undersigned considers the ALJ's conclusions at steps two through five of the sequential evaluation process.[6]

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's limitations did not preclude her from performing work that exists in significant numbers in the national economy. [ECF No. 20 at 1]. She maintains that no treating, examining, or reviewing physician or psychologist found that Plaintiff had functional limitations that precluded work. *Id.* She contends that the ALJ properly concluded that the opinion of Plaintiff's nurse practitioner was entitled to no weight. *Id.* at 21–22. She argues the ALJ reasonably concluded that Plaintiff's allegations of pain and limitations were not entirely credible and were weakened by her relatively conservative treatment and the discrepancies in her subjective complaints. *Id.* at 26–28. She argues the ALJ adequately accounted for all of Plaintiff's limitations in the RFC assessment. *Id.* at 23–26. Finally, the Commissioner maintains that the progress note submitted to the Appeals Council was neither new nor material. *Id.* at 29–30.

---

[6] The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the filing date. Based on Plaintiff's consent to the filing date as her amended AOD, there appears to be no dispute with the ALJ's finding at step one.

### 1.     Severe Impairments

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p *citing* SSR 85-28; *see also* 20 C.F.R. 416.921(a). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).

The ALJ found anxiety and post-traumatic stress disorder to be severe impairments and diabetes, high blood pressure, gastritis, low back pain, and carpal tunnel syndrome to be non-severe impairments. Tr. at 21.

The record supports the ALJ's finding that Plaintiff's nosebleeds resulted from a nasal polyp and were not related to her diagnosis of high blood pressure. *Id.* The undersigned's review of the record yields no evidence to suggest that Plaintiff's ability to perform basic work activities was hindered in any way by high blood pressure.

The ALJ indicated that the record suggested Plaintiff's gastrointestinal problems were mild and produced no significant symptoms. *Id.* He also indicated Plaintiff's testimony that she had lost 30 pounds over the prior four-and-a-half months was refuted by her weight as recorded in the record. *Id.* The undersigned's review of the record

reveals numerous complaints from Plaintiff regarding nausea, epigastric pain, and other symptoms of GERD and gastritis. *See* Tr. at 249, 279, 422, 424–25, 426–27, 428, 432, 434, 437, 440. Plaintiff was diagnosed with H. pylori infection in June 2011. Tr. at 424–27. Although Plaintiff reported a negative reaction to the antibiotics prescribed to treat the infection, the record reflects no significant complaints of gastrointestinal symptoms after she completed the course of antibiotics. *See* Tr. at 422, 424–25. Therefore, the ALJ's conclusion that Plaintiff's gastrointestinal problems produced no significant symptoms or functional limitations was supported by substantial evidence.

The ALJ's conclusion that carpal tunnel syndrome was a non-severe impairment was supported by substantial evidence. Tr. at 21. The ALJ explained that the record contained no evidence of any physical examination showing limited range of motion, diminished grip, or impaired dexterity. *Id.* None of Plaintiff's treating physicians suggested her abilities to use her bilateral arms, wrists, or hands were impaired. *See* Tr. at 248–49, 253, 370, 356, 409, 420, 423, 429, 431, 433, 443, 446–47. Although Ms. Lewis indicated Plaintiff had significant functional limitations, she assessed no significant limitations in Plaintiff's abilities to perform repetitive reaching, handling, or fingering. *See* Tr. at 322. Finally, Dr. Dunbar observed Plaintiff to have normal gross motor and sensory exams during the consultative visit. Tr. at 280.

The ALJ also supported his finding with substantial evidence that Plaintiff's back pain was a non-severe impairment. Tr. at 21. He indicated that Plaintiff's low back pain produced no functional limitations and that Plaintiff demonstrated full range of motion and normal gait. *Id.* He specified that Dr. Dunbar suggested Plaintiff's complaints of pain

27

were inconsistent with the examination and that Plaintiff did not appear to be in that much pain. Tr. at 21–22. The ALJ's findings are consistent with the records of Plaintiff's treating physicians and physician assistant, who recorded no diminished range of motion, tenderness to palpation, abnormal gait, or any other objective findings consistent with functional impairment to Plaintiff's lumbar spine. *See* Tr. at 248–49, 253, 370, 356, 409, 420, 423, 429, 431, 433, 443, 446–47.

Substantial evidence supports the ALJ's conclusion that diabetes was a non-severe impairment. Tr. at 21. The ALJ indicated that Plaintiff was able to control symptoms of diabetes with use of routine medication. *Id.* The undersigned's review of the record reveals that Plaintiff's blood glucose level and A1C were sometimes high, but Ms. Lewis described it as "uncomplicated." *See* Tr. at 266, 410, 447, 449–50. While Ms. Lewis also described Plaintiff's diabetes as "uncontrolled," Plaintiff often admitted to not taking her medications and not following a diabetic diet. *See* Tr. at 230, 265, 269, 410, 419. Despite Plaintiff's complaints of numbness and tingling in her extremities, objective testing showed normal sensation in her feet and no abnormalities in her hands. *See* Tr. at 446–47. Aside from complaints of numbness and tingling, Plaintiff reported no symptoms of diabetes that suggested functional limitations in her ability to work. Therefore, the undersigned recommends the court find the ALJ's conclusion that diabetes was a non-severe impairment to be supported by substantial evidence.

In light of the foregoing, the undersigned recommends the court find that substantial evidence supports the ALJ's step two finding that anxiety and post-traumatic stress disorder were Plaintiff's only severe impairments.

2.     Listings Analysis

"At step three, the ALJ either finds that the claimant is disabled because her impairments match a listed impairment or continues the analysis." *Mascio v. Colvin*, 2015 WL 1219530, at *1. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § 416.925(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § 416.908. The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an impairment is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. § 416.926(a).

To meet Listing 12.04, a claimant must satisfy either the requirements in parts "A" and "B" or the requirements in part "C."[7] 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. To meet Listing 12.06, a claimant must meet the criteria in parts "A" and "B" or parts "A" and "C." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.06. Part "B" of Listings 12.04 and 12.06 requires at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in

---

[7] The ALJ did not discuss part "A" of Listings 12.04 or 12.06. *See* Tr. at 22. Because a claimant cannot meet the requirements of either Listing merely by satisfying part "A," it is unnecessary for the court to consider the part "A" requirements if the ALJ's findings with respect to parts "B" and "C" are supported by substantial evidence.

maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.04(B), 12.06(B). Part "C" of Listing 12.04 requires "a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and either of the following: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of a continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(C). To meet part "C" of Listing 12.06, a claimant must prove that her anxiety-related disorder results in a complete inability to function independently outside her home. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.06(C).

The ALJ specifically considered Listings 12.04 and 12.06. Tr. at 22. He found that Plaintiff did not meet the "B" criteria because she had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. *Id.* He found that Plaintiff's impairment did not meet the "C" criteria of Listing 12.04 because she "has not had repeated episodes of decompensation, a residual disease process, or an inability to function outside a highly supportive environment." Tr. at 23. The ALJ found that Plaintiff's impairment did not meet the "C"

criteria of Listing 12.06 because "the evidence of record does not indicate that the claimant has completely lost the ability to function independently outside his [sic] home." *Id.*

The undersigned recommends a finding that substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not meet the "B" criteria under Listings 12.04 and 12.06. The ALJ explained his conclusions regarding the part "B" criteria in greater detail later in the decision. Tr. at 26–27. With respect to activities of daily living, the ALJ indicated Plaintiff reported to Dr. DePace that she drove, did most of the household chores, read, watched television, and prepared a variety of meals. Tr. at 26. These activities are consistent with the ALJ's finding that Plaintiff had mild restriction of activities of daily living. As for maintaining social functioning, the ALJ indicated Plaintiff informed Dr. DePace that she socialized with friends on the phone and cared for her young granddaughter. *Id.* The ALJ also noted that Plaintiff testified she had a friend who helped her with household chores. *Id.* This evidence supported the ALJ's finding that Plaintiff had moderate difficulties in maintaining social functioning. With respect to concentration, persistence, and pace, the ALJ indicated Dr. DePace's exam revealed Plaintiff to be cooperative and able to follow directions. Tr. at 25. He noted that Plaintiff did well on all testing, except for serial sevens. *Id.* This evidence supported the ALJ's finding that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. Finally, the ALJ pointed out that Plaintiff had not been hospitalized for psychiatric care or received any treatment from a psychiatric professional. Tr. at 26.

Thus, he appropriately concluded that Plaintiff had no episodes of decompensation of extended duration.

Although the ALJ did not further explain his conclusion regarding the "C" criteria of Listings 12.04 and 12.06, a review of the record yields no evidence to suggest that Plaintiff's impairments produced repeated episodes of decompensation, that even a minimal increase in mental demands or change in the environment would likely cause her to decompensate, that she was unable to function outside a highly supportive living arrangement, or that she was completely unable to function independently outside her home. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.04(C), 12.06(C).

In light of the foregoing, the undersigned recommends the court find that substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not meet or equal a Listing.

### 3.    RFC Assessment

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. The ALJ must identify the limitations imposed by the claimant's impairments and assess her work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.*

To assess a claimant's RFC, the ALJ must determine whether the claimant's statements about the effects of her impairments on her functional ability are credible. *Id.*

Allegations of pain or other symptoms in the absence of medical signs and laboratory findings demonstrating the existence of a medically-determinable impairment cannot be the basis for a disability finding. SSR 96-7p. The ALJ should only consider the intensity, persistence, and functionally-limiting effects of symptoms after the claimant has established the existence of a medically-determinable impairment. *Id.* If the claimant establishes the existence of a medically-determinable impairment, the ALJ should then determine the extent to which it affects the claimant's ability to do basic work activities. SSR 96-7p. He should also consider the consistency of the claimant's statements both internally and with other information in the case record. *Id.* The ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

Medical opinions are statements from physicians, psychologists, and other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including the symptoms, diagnosis, prognosis, abilities, and restrictions. 20 C.F.R. §§ 416.927(a)(2); *see also* SSR 96-5p. ALJs are required to consider all medical opinions in the record based on the following criteria: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability based on the medical source's own observations; consistency with the record as a whole; specialization of the medical source; and other factors. 20 C.F.R. § 416.927(c), SSR 96-

2p; *see also Johnson*, 434 F.3d at 654. Medical opinions may only be rendered by "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-3p; *see* 20 C.F.R. § 416.913(a). "Other sources" are defined as individuals other than acceptable medical sources and include medical providers, such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources, such as educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, parents, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. § 416.913(d). While ALJs are not required to meticulously assess opinions from "other sources" based on the criteria in 20 C.F.R. § 416.927(c), these criteria provide a helpful framework for assessing all opinion evidence. SSR 06-3p.

The ALJ found that Plaintiff had the RFC to perform work at all exertional levels, but that she was limited to unskilled work that did not involve contact with the public in performance of job duties and that was at the lowest level of the stress scale. Tr. at 23. He specifically excluded from consideration those jobs that were paid on a piece-rate basis, included work as part of a team, or had a high production quota. *Id.*

In determining Plaintiff's RFC, the ALJ assessed Plaintiff's credibility and explained the reasons for his finding. He found that, although Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning their intensity, persistence, and limiting effects were not credible. Tr. at 24. He explained his conclusion that Plaintiff had no physical limitations

by pointing out that the record contained no evidence of limited range of motion, diminished grip, or inadequate dexterity in Plaintiff's bilateral hands. Tr. at 21. He acknowledged that Plaintiff demonstrated full range of motion of her lumbar spine and that her complaints of pain were inconsistent with objective examinations and observations from the treating and consultative medical providers. Tr. at 21–22. Although the ALJ found Plaintiff to have functional limitations as a result of anxiety and post-traumatic stress disorder, the ALJ concluded they were not as severe as she alleged. Tr. at 24–26. He considered the inconsistencies between Plaintiff's presentation and complaints during the two mental consultative examinations. Tr. at 25. He also reflected on Plaintiff's failure to report mental health-related symptoms to her treating providers during most visits, her failure to obtain specialized mental health treatment, her lack of mental health-related hospitalizations, and indications in the record that her symptoms were well-controlled with medications. Tr. at 25–26. He pointed to other discrepancies in the record regarding Plaintiff's self-reported abilities and limitations. Tr. at 26.

The ALJ also considered all opinion evidence in the record and explained his findings with respect to each of the opinions. He assigned no weight to Ms. Lewis' opinion because she was not an acceptable medical source and her treatment notes contained no clinical observations or findings consistent with the functional limitations she described. Tr. at 27. The ALJ assigned significant weight to Dr. Ginsberg's opinion that Plaintiff could follow rules and comprehend and follow simple instructions, but would be expected to have difficulty dealing with stress and maintaining both speed and endurance in work-related tasks. *Id.* He indicated that Dr. Ginsberg's documented clinical

observations and findings supported his opinion. *Id.* The ALJ assigned significant weight to the opinion of the state agency medical consultant that Plaintiff could understand and remember short and simple instructions, perform simple tasks without special supervision, and maintain a regular work schedule, but may miss an occasional workday due to her conditions and would perform better in a job setting that did not require ongoing interaction with the public. *Id.* He indicated the state agency consultant's opinion was consistent with that of Dr. Ginsberg and considered Plaintiff's subjective complaints regarding her discomfort in crowds. *Id.*

The ALJ considered the lay witness statements from Ms. Corder and Ms. Harmon, but found that they did not establish that Plaintiff was disabled. *Id.* He specified that Ms. Corder's and Ms. Harmon's statements were of questionable accuracy in light of their lack of medical training to make exacting observations. *Id.* He stated that the statements were likely colored by Ms. Corder's and Ms. Harmon's affection for Plaintiff and their natural tendency to agree with the symptoms and limitations Plaintiff alleged. *Id.* Finally, he found that their statements were not supported by the medical evidence of record. *Id.*

The undersigned recommends the court find the ALJ considered the entire record, explained his conclusions, and assessed an RFC that was supported by substantial evidence. The ALJ provided significant justification for his determination that Plaintiff's allegations were not entirely credible. He identified inconsistencies in Plaintiff's statements based on her self-reported activities and limitations, her presentation during examinations, and the objective findings of the treating and examining medical providers. Tr. at 21–22, 24–26. He considered all opinion evidence, including the medical opinions

36

of Dr. Ginsberg and the state agency consultant, the "other source" opinion of Ms. Lewis, and the lay opinions of Ms. Corder and Ms. Harmon. *See* Tr. at 26–27. He specified the weight accorded to all of the opinions and adequately supported his conclusions based on the evidence in the record. *See id.* Because Ms. Lewis was a physician assistant as opposed to an acceptable medical source, the ALJ was not required to assess her opinion based on all the criteria in 20 C.F.R. § 416.920(c). Nevertheless, his opinion reflects consideration of those factors. *See* Tr. at 27. His decision to accord no weight to Ms. Lewis' opinion was supported by a lack of abnormal findings during her examinations, the inconsistency of her opinion with her own records, and the findings of other treating and examining medical providers. *See* Tr. at 271–75, 278–81, 406–52. The ALJ assigned significant weight to the opinions that were consistent with the examination and treatment records and that were rendered by acceptable medical sources that specialized in the field of psychology. *See id.* In light of the ALJ's thorough examination of the record and explanation of his findings, the undersigned recommends the court find the RFC he assessed to be supported by substantial evidence.

### 4.     Ability to Perform PRW and Other Work

At step four, the ALJ must determine whether a claimant is capable of performing her PRW. The ALJ must consider whether the claimant has the RFC to "meet the physical and mental demands of jobs she has performed in the past (either the specific job performed or the same kind of work as it is customarily performed throughout the economy)," and, if the claimant can return to her PRW, she may be found "not disabled." SSR 82-62.

At step five, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The purpose of bringing in a VE is to assist the ALJ in determining if the Commissioner has met this burden. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record" and "must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.*; *see also Johnson*, 434 F.3d at 659; *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

The ALJ found Plaintiff to be incapable of engaging in her PRW, but able to perform other work that existed in significant numbers in the national economy. Tr. at 27–30. Based on the VE's testimony, the ALJ concluded that the mental demands of Plaintiff's PRW exceeded her assessed RFC. Tr. at 28. The ALJ then determined, based on the VE's testimony, that Plaintiff could perform occupations that existed in significant numbers in the national economy and that included laundry worker, dishwasher, janitor, machine tender, inspector, and garment folder. Tr. at 29.

The undersigned recommends a finding that the ALJ's conclusions at steps four and five were supported by substantial evidence. As explained above, the RFC assessment was based on consideration of the entire record. The ALJ concluded Plaintiff

could not perform PRW based on the VE's testimony that the mental limitations assessed would not allow for performance of PRW. *See* Tr. at 88. The RFC he assessed mirrored the hypothetical question he posed to the VE during the hearing, and the VE identified the same jobs cited in the ALJ's decision. *See* Tr. at 87–90. Therefore, the undersigned recommends the court find that substantial evidence supports the ALJ's conclusion that Plaintiff could perform jobs that existed in significant numbers in the national economy.

In light of the foregoing, the undersigned recommends a finding that the ALJ's conclusion that Plaintiff was not under a disability from April 15, 2010, through the date of the decision is supported by substantial evidence.

### 5.    New Evidence Submitted to Appeals Council

Plaintiff submitted to the Appeals Council the treatment note from Dr. Wiggins dated February 7, 2011. Tr. at 454–55.

The SSA's regulations "specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.970(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, *citing Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should

evaluate it as part of the entire record. 20 C.F.R. § 416.970(b). "[I]f the Appeals Council finds that the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence currently of record,'" it shall grant the request for review and either issue a new decision or remand the case to the ALJ for reconsideration of the evidence. *Meyer*, 662 F.3d at 705, *citing* 20 C.F.R. §§ 404.967, 404.977(a), and 404.979. However, if after reviewing the entire record, including the new and material evidence, the Appeals Council "finds the ALJ's action, findings, or conclusions not contrary to the weight of the evidence, the Appeals Council can simply deny the request for review" without explaining its rationale. *Id.*

The undersigned recommends the court find the Appeals Council's determination that the record from Dr. Wiggins did not provide a basis for changing the ALJ's decision to be supported by substantial evidence. Plaintiff submitted one of the two pages from the February 7, 2011, treatment note prior to the ALJ's decision. *See* Tr. at 436. The second page, which was submitted only to the Appeals Council, revealed positive Phalen's maneuver and Tinel's sign in Plaintiff's bilateral wrists, but indicated no specific functional limitations. Tr. at 454. Although the ALJ did not have the opportunity to review one page of the record, he considered Plaintiff's subjective complaints during that examination and a diagnosis of carpal tunnel syndrome. *See* Tr. at 21. A review of the record as a whole, with the inclusion of the second page of notes from Dr. Wiggins' February 7, 2011, examination, reveals the ALJ's conclusion that Plaintiff had no functional limitations as a result of carpal tunnel syndrome to remain supported by

substantial evidence. Therefore, the undersigned recommends a finding that the Appeals Council did not err in denying review after the additional evidence was submitted.

III.   Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

June 4, 2015                             Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).